IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Rachel K. Woods,                  :

    Plaintiff,               :

  v.                              :   Case No. 2:08-cv-320

Burnham Industrial Contractors,   :   Magistrate Judge Kemp
Inc., et al.,

    Defendants.              :

ORDER

This matter is before the Court on the motions for summary judgment filed by defendants Burnham Industrial Contractors, Inc. and Tom Thomas. The motions have been fully briefed. For the following reasons, the motions for summary judgment will be denied.

I.   The Facts

The following facts, construed in the light most favorable to Ms. Woods, are relevant for purposes of the summary judgment motions. Burnham is an industrial and commercial insulation and asbestos/lead abatement company based in Pittsburgh, Pennsylvania. Affidavit of James P. Burnham, Jr. at ¶2 . Burnham provides insulation and asbestos abatement services at various locations. In 2007, Burnham was providing such services at the Burger Power Plant in Belmont County, Ohio. Id. at 3. Burnham hired union laborers for the project at Burger including plaintiff Rachel Woods and her husband, Ray Woods. Id. at 4-5. The Woodses were asbestos abatement workers and were members of Local 207, Asbestos Abatement Workers' Union. Deposition of Rachel K. Woods, at 30. The Woodses got their work with Burnham through Local 207 and had worked for Burnham at other locations

prior to the Burger job.  Id. at 33-34.  The jobs for Burnham lasted between weeks and months and the Woodses had many jobs with Burnham over the years.  Id. at 35.  The Woodses had worked at Burger one other time prior to the job which began in January 2007.  Id. at 37.  Mr. Woods handled the task of securing the couple's jobs through the union.  Id. at 41.

Ms. Woods and her husband always worked their jobs together.  Deposition of Rachel K. Woods, Volume I, at 39.  Ms. Woods preferred to work with her husband because there are typically a lot of men on the jobs and not very many women.  Id.  She considered her husband to be her "protector."  Id.

Tom Thomas, a Burnham employee, supervised Ms. Woods and her husband during the time they worked at Burger from January 2007 through April 26, 2007 when they were laid off at their request.  Burnham affidavit at ¶¶6-7.  Tom Thomas did not supervise them on their previous job at Burger.  Deposition of Rachel K. Woods, at 37.  Initially at the Burger job, the Woodses were removing asbestos but they were asked to stay and perform insulation work during the last three weeks of their time there.  Id. at 42.

From January 2007 until approximately the last ten days of her employment at Burger, Mr. Thomas showed no interest in Ms. Woods.  Deposition of Rachel K. Woods, at 129-131.  During the final days of her employment at Burger, several encounters occurred between Ms. Woods and Mr. Thomas.  This first series of encounters occurred on April 18, 2007, beginning in the break room when, in response to Ms. Woods' being visibly upset, Mr. Thomas put his arms around her and kissed her forehead.  Id. at 111.  Ms. Woods pulled away and told Mr. Thomas not to do that.  Id.  Later, Mr. Thomas asked Ms. Woods to come with him to do a job and then grabbed her face and kissed her on the lips.  Id. at 114.  Ms. Woods pushed him away, proceeded to do the job, and told Mr. Thomas, "don't touch me again – I love my husband and

kids, I don't want to do this."  Id. at 114-115.  Ms. Woods was following Mr. Thomas out of the area shaking and scared when Mr. Thomas turned around and brushed his hand along her lower abdomen.  Id. at 116, 118.  Ms. Woods ran away but did not report this activity to anyone.  Id. at 118.  Following this incident, Ms. Woods got into an elevator with Mr. Thomas.  Id. at 119. In the elevator, Mr. Thomas grabbed Ms. Woods and pulled her toward him and kissed her on the face and lips.  Id. at 121-23. Ms. Woods pushed him back and told him to stop.  Id. at 121-124.

Ms. Woods was afraid to tell her husband about these encounters on April 18, 2007, because she feared he would kill Mr. Thomas.  Deposition of Rachel K. Woods, at 124.  After the encounter in the elevator, Ms. Woods did tell her husband she was sick.  Id. at 135.  She also went home and threw up and cried almost all night long.  Id.  Ms. Woods requested that her husband ask for a layoff.  Id. at 124-125.  Rather than telling her husband the real reason for her layoff request, Ms. Woods told him that she wanted a layoff to have time with their six children before going to the Indiana job.  Id. at 126.  She believed this was necessary because "things would have gone very badly had he known what was going on."  Id.  According to Ms. Woods she had been told by Mr. Thomas that "guys die on jobs like this all the time."  Id. at 127.  Apparently, Mr. Woods requested the layoff and in response was told by Mr. Thomas that if the Woodses were laid off, they would not be hired back because Mr. Burnham would not like the fact that they left when work still needed to be done.  Id. at 129.

On April 19, 2007, Mr. Thomas asked Ms. Woods, in front of her husband, to accompany him to get a face shield for Mr. Woods. Deposition of Rachel K. Woods, at 131.  Ms. Woods acquiesced fearing that, if she declined the request, her husband would know that something was going on.  Id. at 132-133.  Mr. Thomas grabbed

3

Ms. Woods and kissed her again. Id. at 134. Ms. Woods pushed him away and stated, "Tom, stop. I don't want you." "I love my husband." Id. at 134. In response, Mr. Thomas told her, as he had many times, that "guys die in places like this every day." Id. at 134. Ms. Woods perceived this statement as a threat. Id. at 135.

Despite her fear that her husband would kill Mr. Thomas if he found out about these encounters, Ms. Woods continued with her job. Deposition of Rachel K. Woods, at 136. She also continued to ask her husband to request a layoff. Id. Mr. Thomas' sexual advances were the reason for her continued layoff request. Id. at 267. Between April 19th and April 26, 2007, Mr. Thomas mouthed sexually explicit statements to Ms. Woods even if her husband was standing with her. Id. at 137. Mr. Thomas also came into the Woodses work area and stared at Ms. Woods. Id. at 138. While Mr. Woods was unaware of Mr. Thomas' actions, he did know that something at work was upsetting his wife. Id.

One afternoon in the break room which doubled as Mr. Thomas' office, Ms. Woods and her husband were taking a break before going home and began watching a comedy movie with Mr. Thomas. Deposition of Rachel K. Woods, at 141-142, 169. Mr. Woods fell asleep. Id. at 142. While Mr. Woods slept, Mr. Thomas repeatedly requested that Ms. Woods show him her breast. Id. at 143-145. Feeling that she had no other choice, Ms. Woods complied with the request while telling Mr. Thomas to leave her alone. Id. at 149-150. After exposing her breast, Ms. Woods tried to wake her husband by quietly kicking his chair but she could not awaken him. Id. at 152. After checking the door to see if anyone was coming, Mr. Thomas exposed himself to Ms. Woods and began masturbating in front of her while Mr. Woods slept a few feet away. Id. at 158-159. Ms. Woods did not move or try to wake her husband again. Id. at 160-164. Ms. Woods felt like

4

throwing up but she didn't.  Id. at 164.  When he finished, Mr. Thomas left the room to take a shower leaving the Woodses alone in the breakroom.  Id.  Mr. Thomas admits that this particular encounter occurred.  Deposition of Tom Thomas, at 31.

When Mr. Woods woke up a couple of minutes later, the Woodses went home.  Deposition of Rachel K. Woods, at 169.  Ms. Woods would not tell her husband what was bothering her because she didn't think he could handle it, although he continued to suspect that something was going on at work.  Id. at 184.  That night at home he got drunk and, from Ms. Woods' perspective, may have tried to commit suicide.  Id. at 179.  There was some discussion between Mr. Woods and Mr. Thomas both that night and the following day at work.  Id. at 174-175.

Also, on the following day at work, Mr. Thomas asked Ms. Woods to go to the locker room with him.  Deposition of Rachel K. Woods, at 184.  Mr. Thomas locked the door, started kissing Ms. Woods on the lips, pushing himself into her, and trying to put his hands in her shirt and her pants.  Id. at 185-186.  Ms. Woods grabbed his hand and told him to stop.  Id at 186.  She also told him about Mr. Woods' suicide attempt.  Id.  At this point, Mr. Thomas unlocked the door, listened to Ms. Woods' explanation of how upset her children were following the previous night's events, and then responded to her with a highly sexual comment.  Id.  Mr. Thomas also requested a "goodbye" kiss from Ms. Woods but she pushed him away.  Id.

While Ms. Woods had asked Mr. Woods to request a layoff every day once the encounters with Mr. Thomas began, the Woods' layoff request was finally granted on April 26, 2007. Deposition of Rachel K. Woods, at 187.  On their last day on the job, at some point the Woodses and Mr. Thomas were talking together when Mr. Thomas, while standing behind Mr. Woods but facing Ms. Woods, exposed his penis to her.  Id. at 191.  Ms. Woods was upset by

5

this but did not scream or say anything.  Id. at 192.

Prior to the encounters between Mr. Thomas and Ms. Woods, there was an incident where Ms. Woods and her husband discovered a sculpture of a penis, made out of insulating material called "blue ram," in a boiler at Burger.  Deposition of Rachel K. Woods, at 95.  Mr. Thomas was amused by the sculpture.  Id. at 100.  Various pranks followed this discovery including one where the sculpture was strapped to the Woods' car.  Id. at 243.  Another incident involved Mr. Woods, while accompanied by Mrs. Woods, purchasing at a sex store straws and toothpicks shaped like penises.  Id.  Mr. Woods brought them into the workplace and displayed them on a lunchroom table.  Id. at 243-244.  Ms. Woods did not express her offense to the jokes or pranks but she did not think they were funny.  Id. at 105, 243.

After they left the Burger job, the Woodses worked for NEC in Indiana performing asbestos removal at Indiana University.  Deposition of Rachel K. Woods, at 43.  It was during their time in Indiana that Ms. Woods told her husband about the various encounters with Mr. Thomas.  Id. at 199.  Ms. Woods said she chose to tell Mr. Woods about these encounters once they were in Indiana because she felt "things were a lot safer being out of state."  Id.  As Ms. Woods testified, "[i]t wasn't like he was right there and could snap and go fly off on him." Id. at 340.

While the Woodses were in Indiana, Ms. Woods placed three calls to Mr. Thomas in an effort to demonstrate to Mr. Woods the role Mr. Thomas had played in the encounters.  Deposition of Rachel K. Woods, at 201.  Ms. Woods recorded each of the three calls.  Id.  Ms. Woods' purpose in recording these calls was to obtain proof of what had happened because Mr. Thomas had always made sure there were no witnesses to his activities.  Id. at 216-217. Mr. Woods was upset that Ms. Woods had not told him earlier but Ms. Woods explained that she had feared that Mr. Woods would

kill Mr. Thomas. Id. at 310. Ms. Woods also told Mr. Woods about Mr. Thomas' telling her more than once "that guys die on jobs like this all the time" and how upset she was by this. Id.

In September 2007, Ms. Woods contacted the EEOC. Deposition of Rachel K. Woods, Vol. I, at 85. The time lapse between telling Mr. Woods and filing an EEOC charge was due to the fact that the Woodses didn't know what to do. Id. at 86-87. The EEOC did not ask Burnham to submit a position statement. Burnham Aff. ¶8. The EEOC issued its right to sue letter on January 9, 2008, stating that it could not determine from the information whether a violation of the law had occurred. Deposition of Rachel K. Woods Dep. Exhibit 12. The Woodses worked for Burnham again in 2008 at a facility in Niles, Ohio. Id., Exhibits 1 and 2.

## II. The Summary Judgment Standard

Summary judgment is not a substitute for a trial when facts material to the Court's ultimate resolution of the case are in dispute. It may be rendered only when appropriate evidentiary materials, as described in Fed. R. Civ. P. 56(c), demonstrate the absence of a material factual dispute and the moving party is entitled to judgment as a matter of law. Poller v. Columbia Broadcasting Systems, Inc., 368 U.S. 464 (1962). The moving party bears the burden of demonstrating that no material facts are in dispute, and the evidence submitted must be viewed in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). Additionally, the Court must draw all reasonable inferences from that evidence in favor of the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654 (1962). The nonmoving party does have the burden, however, after completion of sufficient discovery, to submit evidence in support of any material element of a claim or defense on which that party would bear the burden of proof at trial,

even if the moving party has not submitted evidence to negate the existence of that material fact. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). Of course, since "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact," Celotex, 477 U.S. at 323, the responding party is only required to respond to those issues clearly identified by the moving party as being subject to the motion. It is with these standards in mind that the instant motion must be decided.

### III. Ms. Woods' Sexual Harassment Claims

Ms. Woods alleges in her complaint that, in April 2007, she was the subject of unwelcome sexual harassment by her supervisor, Tom Thomas. According to the complaint, Mr. Thomas asked Ms. Woods for sexual favors, made vulgar communications and sexual advances toward her, and touched her sexually. Ms. Woods has asserted a claim under Title VII against Burnham based on the these alleged actions.

Ms. Woods is also pursuing a state law claim against Mr. Thomas for a violation of Ohio Revised Code §4112.02 (Ohio Civil Rights Act). Under the Ohio Civil Rights Act, unlike under Title VII, an individual supervisor may be held liable for discriminatory conduct. Genaro v. Cent. Transp., Inc., 84 Ohio St.3d 293, 300 (1999). A sexual harassment claim under the Ohio Civil Rights Act, however, is generally analyzed using the same factors applied to one under Title VII. Plumbers & Steamfitters Joint Apprenticeship Comm v. Ohio Civil Rights Comm'n, 66 Ohio St.2d 192, 196 (1981). Consequently, federal case law interpreting Title VII applicable to her claim against Burnham is equally applicable to Ms. Woods' state law claim against Mr.

8

Thomas.

Title VII prohibits two types of sexual harassment: (1) harassment that creates a hostile or offensive working environment and (2) *quid pro quo* harassment in which a supervisor demands sexual favors as a condition for job benefits. Duggins v. Steak 'N Shake, Inc., 3 Fed.Appx.302 (6th Cir. 2001). While not clearly delineated, it appears that Ms. Woods has attempted to allege both types in her complaint.

Ms. Woods also makes reference to the issue of constructive discharge twice in her complaint although it is not identified as a separate claim. Rather, Ms. Woods contends that Mr. Thomas' alleged quid pro quo sexual harassment resulted in her constructive discharge. Complaint at ¶15. Additionally, at paragraph 16 of her complaint, Ms. Woods alleges that her working conditions were so severe that she was forced to terminate her employment. The Court construes these latter allegations as Ms. Woods' attempt to state a compound hostile environment-constructive discharge claim against Burnham. See Pennsylvania State Police v. Suders, 542 U.S. 129 (2004); Plautz v Potter, 156 Fed.Appx. 812 (6th Cir. 2005)("In Suders, the Supreme Court explicitly held what the circuit courts had been in agreement about for years: an employer can be held liable under Title VII for constructive discharge").

A. <u>Sexually Hostile Work Environment/Constructive Discharge</u>

Turning first to the sexually hostile work environment claim, to prevail on such a claim, Ms. Woods must allege and demonstrate that (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on her sex; (4) the harassment created a hostile work environment; and (5) Burnham is vicariously liable. Clark v. United Parcel Serv., Inc., 400 F.3d 341 (6th Cir. 2005). Burnham asserts that Ms. Woods has failed to

9

establish the second and fourth elements of her prima facie case - that the alleged sexual harassment was unwelcome or that Mr. Thomas' actions created a hostile work environment.  Mr. Thomas' motion for summary judgment, far from a model of clarity, appears to address only the fourth element - whether a hostile work environment existed.  Both defendants rely primarily on the deposition testimony of Ms. Woods and various deposition exhibits.

With respect to the second element, the Court finds that Ms. Woods has raised a genuine issue of material fact as to whether Mr. Thomas' alleged sexual advances were unwelcome.  Ms. Woods' testified in response to questioning regarding every such encounter that she told Mr. Thomas to stop, pushed him away, or told him she didn't want to do it because she loved her husband and children.  This is certainly evidence from which a reasonable jury could conclude that Ms. Woods did not welcome Mr. Thomas' advances.

To the extent that Burnham relies on her participation in the various pranks following the discovery of the blue ram sculpture as evidence that Ms. Woods did not find these types of activities unwelcome, again the Court finds that Ms. Woods has raised a genuine issue of material fact.  With respect to the pranks, Ms. Woods testified that she found them offensive and that her husband was actively participating while she was present for some of them or merely accompanying him at other times.  Ms. Woods also testified that she was the only woman on the Burger job and that she viewed her husband as her protector.  Under such circumstances, it is conceivable that a reasonable jury could find that Ms. Woods did take offense to these jokes but chose not to react.

Further, to the extent that Burnham relies on her failure to complain about Mr. Thomas' actions as evidence that Ms. Woods

welcomed such activities, she also has raised a genuine issue of material fact based on her testimony. Ms. Woods testified at length regarding her mental state at the time she was allegedly being pursued by Mr. Thomas. Ms. Woods stated that she didn't tell her husband out of fear that he would kill Mr. Thomas. Under a fair reading of Ms. Woods' testimony, a factfinder could conclude that Ms. Woods did not have many other options for reporting, or did not perceive that she had any such options, Mr. Thomas' conduct. For example, Mr. Thomas was the job supervisor at Burger and there was no higher authority on the job site. While Ms. Woods had worked for Burnham previously, she had never met Mr. Burnham and no testimony indicated that she had any other contacts at Burnham. Mr. Woods was primarily responsible for securing their jobs and dealing with the union. This evidence, coupled with the nature of the allegations and the fact that they occurred over an approximate ten-day period, could allow a jury to conclude that Ms. Woods' failure to complain resulted from something other than her solicitation of Mr. Thomas' alleged behavior.

With respect to the fourth element, Mr. Thomas' conduct must have been "sufficiently severe or pervasive to alter the conditions of [Ms. Woods'] employment and create an abusive work environment." Hollar v. RJ Coffey Cup, LLC, 505 F.Supp.2d 439 (N.D. Ohio 2007)(quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). "Conduct that is merely offensive, however, is not actionable." Id. (quoting Knox v. Neaton Auto Products Mfg., Inc., 375 F.3d 451 (6th Cir. 2004). Both a reasonable person and the victim must consider the conduct to be hostile. Id. That is, a plaintiff must present sufficient evidence indicating that the alleged conduct was both objectively and subjectively hostile. Courts do not apply a precise, mathematical formula, but instead consider the totality of the circumstances, including

factors such as the frequency and severity of discriminatory conduct, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.  The harassment must also be ongoing rather than a set of "isolated or sporadic" incidents.  Clark, 400 F.3d 341, 351.

Ms. Woods must also show that the harassment was subjectively hostile.  "[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment and there is no Title VII violation."  Harris, 510 U.S. 17, at 21-22.  A plaintiff need not demonstrate that she found her working environment intolerably hostile to satisfy the subjective component.  "An extreme level of distress is not required to prevail on a hostile work environment claim   ... [less severe] allegations ... sufficed to show that [plaintiff] subjectively perceived the work environment as hostile."  Hollar, 505 F.Supp.2d 439, 450 (quoting Hanley v. Chevy Chaser Magazine, 199 Fed.Appx. 425 (6th Cir. 2006).  This subjective test does not require that the plaintiff feel physically threatened.  Id. (quoting Williams 187 F.3d at 566 (6th Cir. 1999)).  Further, it does not require that a plaintiff report a hostile work environment.  Id.  Rather, courts recognize that despite severe or pervasive sexual harassment, a plaintiff might have a number of valid reasons for not reporting it.  Id. (citing Lemmings v. FedEx Ground Package Sys., 492 F.Supp.2d 880 (W.D. Tenn. 2007).

Despite the allegations of the complaint, all parties view Ms. Woods' hostile work environment sexual harassment claim as arising from two separate series of incidents - the pranks and the actions of Mr. Thomas - and this is reflected in their summary judgment arguments relating to the fourth element.  With respect to the pranks, Burnham claims, based on the deposition

testimony of Jason Ferguson, that Ms. Woods laughed at the pranks and that this demonstrates that she did not perceive a sexually hostile work environment.  Additionally, as with the second element, Burnham claims that Ms. Woods did not express offense to the blue ram sculpture.

With respect to Mr. Thomas' alleged actions, Burnham claims essentially that, because the alleged sexual harassment took place over a short period of time, it cannot be found to have been objectively hostile when considering all of the circumstances.  Burnham also reiterates its position that the encounters between Mr. Thomas and Ms. Woods were clearly consensual as its relates to Ms. Woods' subjective perception of sexual harassment.  Mr. Thomas makes similar arguments.  Mr. Thomas claims also that, because he had no responsibility for the blue ram sculpture, this cannot be considered in any hostile work environment claim against him.  Both defendants cite to a number of cases where the claim that summary judgment was granted on a hostile environment sexual harassment claim on facts similar to those presented here.

The Court finds that Ms. Woods has raised a genuine issue of material fact regarding whether a hostile work environment existed.  The conduct alleged here involves both pranks of a sexual nature as well as physical contact and sexual actions. The Sixth Circuit has held that "[A]cts of touching and unwelcome physical contact ... establish an element of physical invasion" and "harassment involving an 'element of physical invasion' is more severe than comments alone."  Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321 (6th Cir. 2008)(reversing district court grant of summary judgment where plaintiff's evidence included not only sexually explicit comments but also acts of touching and unwelcome physical contact).

Based on the nature of Mr. Thomas' both alleged and

undisputed conduct, and the fact that his behavior escalated to such a point over a very short period of time, a reasonable jury could conclude that Ms. Woods endured severe, if not, pervasive conduct. Moreover, whether conduct is severe or persuasive is "quintessentially a question of fact." Jordan v. City of Cleveland, 464 F.3d 584 (6th Cir. 2006). Consequently, on the basis of Mr. Thomas' conduct, let alone this conduct in conjunction with the pranks, the defendants are not entitled to summary judgment on the issue of whether Ms. Woods has established an objectively hostile work environment.

Further, Ms. Woods has raised a genuine issue of material fact with respect to her subjective perception of hostility as well. She testified to her mental distress both about the incidents and about keeping the information from her husband. Further, she stated that she was sick about Mr. Thomas' actions, threw up and cried at home over at least one incident, and feared for her husband's safety and her own. As a result, according to her testimony, she continually requested that her husband ask for a layoff so she could leave Burger. In fact, Ms. Woods specifically testified that the reason she was asking her husband to request a layoff was because of Mr. Thomas' sexual advances.

The Court notes that defendants' primary defense to this claim is that Ms. Woods was engaged in a consensual relationship with Mr. Thomas. Ms. Woods, however, denies this allegation repeatedly in her deposition testimony. The defendants' secondary argument is that Ms. Woods' response to the pranks belies that she found such antics offensive. Again, Ms. Woods has testified regarding her response to these activities. Consequently, the real issue here comes down to credibility. Assessing credibility is a jury matter and, therefore, a court cannot make credibility determinations on summary judgment. See Anderson v. Liberty Lobby, 477 U.S. at 255. While a factfinder

may ultimately find that Ms. Woods' work environment was not as she has portrayed it, that is not the Court's job here.

Burnham addresses the issues raised by Ms. Woods' alleged constructive discharge as an independent claim rather than a compound claim related to Ms. Woods' hostile work environment claim. Burnham's position is that Ms. Woods "has failed to provide any evidence of a hostile environment at Burnham, let alone a worse than hostile environment." Motion for Summary Judgment at 16. Stated more precisely, Burnham seems to be arguing that, because Ms. Woods' hostile work environment claim fails, her constructive discharge claim must fail as well.

In order to prove that she was constructively discharged based on a hostile working environment, Ms. Woods must establish that her working conditions were so intolerable that a reasonable person would have felt compelled to quit her job. <u>Pennsylvania State Police v. Suders</u>, 542 U.S. 129 (2004). Burnham does not address this issue directly. Even if Burnham had not given this issue such short shrift, however, it would not be entitled to summary judgment on this claim. Ms. Woods' constructive discharge claim is predicated on the same facts as her hostile work environment claim. Consequently, the same reasons that preclude summary judgment on Ms. Woods' hostile work environment claim preclude summary judgment on this claim. <u>See</u> <u>Ojemudia v. Rite Aid Services, L.L.C.</u>, 540 F.Supp.2d 855 (E.D. Mich. 2008).

### B. Quid Pro Quo Claim

Quid pro quo sexual harassment occurs where the employee's submission to sexual advances is a condition for receiving job benefits. <u>Hollar</u> (citing <u>Kauffman v. Allied Signal, Inc., Autolite Div.</u>, 970 F.2d 178, 182 (6th Cir. 1992)). To prevail on her quid pro quo sexual harassment claim Ms. Woods must establish that: (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment in the form of sexual

advances or requests for sexual favors; (3) the harassment complained of was on the basis of sex; and (4) submission to the unwelcome advances was an express or implied condition for receiving job benefits or the employee's refusal to submit to the supervisor's sexual advances resulted in a tangible job detriment.  With respect to her claim against Burnham, Ms. Woods must also establish the existence of respondeat superior liability.

The extent of Ms. Woods' quid pro quo sexual harassment claim appears to be set out at paragraphs 14 and 15 of the complaint.  In paragraph 14, Ms. Woods states, "Burnham/Local 2 Supervisor, Tom Thomas indicated that a refusal to submit to sexual advances would result in a tangible job detriment, unemployment ("You will not be hired back if you leave.").  In paragraph 15, Ms. Woods asserts that Mr. Thomas' actions were done as a threat to her employment because of Mr. Thomas' authority to make personnel decisions.  Further, in paragraph 15, Ms. Woods states "Thomas' quid pro quo harassment resulted in a tangible and adverse employment action, constructive discharge. Constructive discharge constitutes a significant change in job status."

Burnham asserts that Ms. Woods has no evidence that she suffered a tangible job detriment and, as a result, has failed to satisfy the fourth element of her quid pro quo claim.  According to Burnham, when specifically questioned regarding any threats to her job made by Mr. Thomas, Ms. Woods replied, "other than being - my husband asking for the layoff and telling us we wouldn't be hired back by Burnham, none that I can recall."  Deposition of Rachel K. Woods, Vol. III, at 196-197.

Mr. Thomas' motion for summary judgment briefly addresses the issue of liability based on an adverse employment action, but does not identify this argument as relating to Ms. Woods' quid

16

pro quo sexual harassment claim.  While questioning, without citation, the availability of an "adverse employment action claim" against a supervisor, Mr. Thomas argues that Ms. Woods did not suffer an adverse employment consequence.  The Court construes this argument as one claiming that Ms. Woods has failed to meet the fourth requirement of a quid pro quo claim.

   Ms. Woods contends that she suffered a tangible job detriment in various ways.  First, according to Ms. Woods, she was forced to submit to Mr. Thomas' unwelcome sexual advances in order to protect her own safety and her husband's safety on the job.  Further, Ms. Woods contends that she was told that Burnham would not hire her or her husband back if the layoff request was granted.  Additionally, Ms. Woods asserts that she was constructively discharged when the sexual harassment became so intolerable that she had no choice but to request the layoff and leave Burger.

   Before addressing the merits of the parties' arguments, the Court notes that none of the them recognize that the fourth element of a quid pro quo claim is written in the alternative.  That is, Ms. Woods can establish the fourth element of this claim if she demonstrates <u>either</u> (a) that her submission to the unwelcome advances was an express or implied condition for receiving job benefits <u>or</u> (b) that her refusal to submit to the supervisor's sexual advances resulted in a tangible job detriment.  The allegations of Ms. Woods' complaint at paragraph 14 appear to be addressed to the first phrase of the disjunctive and the allegations of paragraph 15 appear to be addressed to the second.  Neither of the defendants has noted this distinction in their motions and have instead focused only on the second phrase and the concept of an adverse employment action specifically.  Ms. Woods, apparently following the defendants' lead, has blurred the requirements of the two phrases in her response.   Given the

allegations of the complaint, however, the Court will address the fourth element as it is generally interpreted in determining whether Ms. Woods' quid quo pro sexual harassment claim can survive summary judgment.

Ms. Woods characterizes her testimony regarding Mr. Thomas' statement that "guys die on jobs like this everyday" as raising a genuine issue of material fact concerning an adverse employment action. The Court, on the other hand, finds this testimony to be more appropriately directed to the issue of whether Ms. Woods' submission to Mr. Thomas' alleged unwelcome advances was an express or implied condition for receiving job benefits - the job benefit here being that neither her husband nor potentially she would somehow die on the job at Burger. Ms. Woods testified that Mr. Thomas made this statement to her many times including during an alleged sexually harassing encounter on April 19, 2007. Further, according to Ms. Woods' testimony, at least during this particular encounter, she perceived this statement as a threat in response to her telling Mr. Thomas to stop.

Viewing these facts in the light most favorable to Ms. Woods, a reasonable jury could find that her submission to Mr. Thomas' alleged unwelcome advances was in exchange for her husband's life, or perhaps her own, not being lost on the job. Consequently, the Court finds that Ms. Woods has raised a genuine issue of material fact on this issue sufficient for her quid pro quo claim to survive summary judgment. Further, in light of this finding, the Court has no need to address the other issues raised by the parties with respect to this claim.

### IV. <u>Remaining State Law Claims Against Tom Thomas</u>

Ms. Woods also alleges state law claims of assault and battery and intentional infliction of emotional distress against Mr. Thomas. The sole basis for Mr. Thomas' motion for summary judgment as to these claims is the argument that he was engaged

in a consensual sexual relationship with Ms. Woods. As set forth above, Ms. Woods has raised a genuine issue of material fact with respect to the consensual nature of the relationship. Consequently, Mr. Thomas' motion for summary judgment will be denied as to these claims.

Further, the Court declines to entertain Mr. Thomas' request for a discretionary dismissal under 28 U.S.C. §1367. Contrary to Mr. Thomas' assertion, the Court does not view this case as one where state law claims predominate.

## V. Disposition

Based on the foregoing, the motions for summary judgment, #33 and #34, are DENIED.

/s/ Terence P. Kemp
United States Magistrate Judge